UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAVERHILL COKE COMPANY LLC,<br>Petitioner,<br>-v-<br>ALGOMA STEEL, INC.,<br>Respondent. | 26-cv-4407 (JSR)<br>OPINION |

JED S. RAKOFF, U.S.D.J.:

On June 18, 2026, this Court issued a "bottom line" Order confirming its prior ex parte order of attachment in aid of arbitration entered against respondent Algoma Steel, Inc. ("Algoma") and in favor of petitioner Haverhill Coke Company LLC ("Haverhill").[1] See ECF No. 27. This Opinion sets forth the reason for that Order.

## I. Background

Petitioner Haverhill is a large producer of coke, a solid fuel used in making steel. Haverhill is organized in Delaware with a principal place of business in Ohio.[2] See ECF No. 13

[1] Except where otherwise indicated, all quotations in this Opinion omit citations, quotation marks, footnotes, brackets, ellipses, and other non-substantive alterations in source material.

[2] Haverhill is wholly owned by Sun Coal & Coke LLC, which is organized in Delaware with a principal place of business in Illinois. See Pet. ¶ 13. Sun Coal & Coke LLC is a wholly owned subsidiary of SunCoke Energy Inc., which is incorporated in Delaware with a principal place of business in Illinois. Id.

("Pet."). Respondent Algoma Steel Inc. ("Algoma") is a large steel producer incorporated in British Columbia, Canada, with a principal place of business in Sault Ste. Marie, Ontario, Canada. Id. ¶ 15-16. Algoma is a wholly owned subsidiary of Algoma Steel Holdings, Inc., which is wholly owned by Algoma Steel Group Inc. ("ASG"). See ECF No. 19 at 4 ("Resp. Mem.").

According to Haverhill, under a coke Shipment Sale and Purchase Agreement for the purchase of coke (the "Coke Agreement") dated December 31, 2021, and subsequent letters between Haverhill and Algoma, Algoma agreed to purchase coke on a "take-or-pay" basis through December 31, 2026. The agreement involves the manufacture of coke outside New York, delivery to an Ohio terminal for Algoma's pickup for use in Canadian manufacturing, and payment to Haverhill in Illinois. See ECF 13-3. Included as a schedule within the Coke Agreement is a Buyer Guaranty Agreement (the "Guaranty") also dated December 31, 2021, between ASG (listed as "Guarantor") and Haverhill (listed as "Beneficiary"). See id. Algoma was not a signatory of the Guaranty but is listed as the "Obligor." Id.

On September 24, 2025, Algoma informed Haverhill that it would not accept delivery after the next pending shipment of coke. Pet. ¶ 35. Algoma's position was then, as it is now, that the Coke Agreement had been discharged because it was rendered commercially impractical by U.S. tariffs imposed on Canadian

steel imports. Id. ¶¶ 35-38. Haverhill disputed the purported discharge of the Coke Agreement and contended that the agreement remained in force. Id. ¶ 39.

On October 28, 2025, Haverhill filed an arbitration demand against Algoma for allegedly failing to perform its obligations under the Coke Agreement. Pet. ¶¶ 1-2, 40-41. In the arbitration, Haverhill seeks a declaration that the Coke Agreement remains binding with an order of specific performance, or, in the alternative, a monetary award based on material breach. Id.

Haverhill now brings the instant petition seeking an order of attachment in aid of arbitration. Haverhill filed the petition on May 20, 2026, to attach any of Algoma's assets in this district as security for Haverhill's breach of contract claims against Algoma in the ongoing arbitration. See ECF id. On June 1, 2026, upon Haverhill's ex parte petition, the Court issued an order of attachment in aid of arbitration against Algoma. The Court granted Haverhill's ex parte petition, attaching any monies, accounts, property, or other interests in New York belonging to Algoma, including held by others, up to the amount of $25,700,865.60. See ECF No. 14-16.

On June 11, 2026, Haverhill filed the instant motion seeking to confirm the pre-award attachment. See ECF No. 14. The motion was fully briefed on June 17, 2026, and the Court held

oral argument on June 18. The Court issued a bottom-line ruling confirming the June 1 order of attachment. This Opinion explains the reasons for that bottom-line order.

## II. Analysis

The Court first takes up the threshold matter of jurisdiction and concludes that it may properly exercise personal jurisdiction over Algoma for purposes of the instant petition for attachment. Having concluded that jurisdiction is proper, the Court next considers whether Haverhill has met its burden to show that attachment is merited in this case. The Court concludes that it has. Thus, the Court confirms its June 1 order of attachment.[3]

### A. Jurisdiction

"It is axiomatic that for property or a debt to be subject to attachment under [N.Y.] C.P.L.R. 6202, it must be amenable to the jurisdiction of the court." Wilcox v. Richmond, F. & P. R. Co., 270 F. Supp. 454, 456 (S.D.N.Y. 1967).[4] Here, there are two

---

[3] Attachment in aid of arbitration "is available in federal court under the law of the state where the court is located." Iraq Telecom Ltd. v. IBL Bank S.A.L., 43 F.4th 263, 269 (2d Cir. 2022); see Fed. R. Civ. P. 64. Accordingly, New York state law "governs this Court's evaluation of [pre-award] orders of attachment." JP Morgan Chase Bank, N.A. v. Reijtenbagh, 615 F. Supp. 2d 278, 280 (S.D.N.Y. 2009).

[4] Haverhill brings the instant petition for attachment pursuant to N.Y. C.P.L.R. 7502(c), which "regulates applications for provisional remedies ancillary to arbitration proceedings [and] authorizes an order of attachment . . . pursuant to an

possible jurisdictional avenues that are relevant to Haverhill's petition. First, a court with personal jurisdiction over a party against whom attachment is sought "has jurisdiction over that [party's] tangible or intangible property, even if the situs of the property is outside New York." Hotel 71 Mezz Lender LLC v. Falor, 14 N.Y.3d 303, 312 (2010). And second, "under the doctrine of quasi in rem jurisdiction, plaintiff is allowed to attach any property defendant happens to have in New York and use it as a jurisdictional basis." Id. at 311 n.6.

Here, the Court travels the first avenue and concludes that personal jurisdiction is properly asserted over Algoma.[5] The Court agrees with Haverhill that ASG consented to the exclusive jurisdiction of this Court via the Guaranty's forum selection clause, and that this consent is sufficient to bring Algoma within this Court's jurisdiction.

---

arbitrable controversy." Sierra USA Commc'ns, Inc. v. Int'l Tel. & Satellite, Corp., 14 Misc. 3d 528, 530 (N.Y. Sup. Ct. 2006). Application of Section 7502(c)is governed by C.P.L.R. Articles 62 and 63. See N.Y. C.P.L.R. 7502(c). Thus, any limits on attachment pursuant to C.P.L.R. 6202 are applicable here.

[5] Because the Court concludes that it may properly exercise personal jurisdiction over Algoma, it is not necessary to reach the parties' dispute as to the existence of quasi in rem jurisdiction.

**1. The Guaranty's Forum Selection Clause is Valid and Enforceable Against Algoma**

"Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements." D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 103 (2d Cir. 2006). Accordingly, where an agreement contains a valid and enforceable forum selection clause,[6] "it is not necessary to analyze jurisdiction under New York's long-arm statute or federal constitutional requirements of due process." Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc., 328 F. Supp. 3d 329, 335 (S.D.N.Y. 2018). Thus, here, the relevant question is whether the forum selection clause contained in the Guaranty signed by ASG is valid and enforceable against Algoma.

A forum selection clause is presumptively enforceable "if the party seeking to enforce the clause can show that: (1) the clause was reasonably communicated to the party resisting enforcement; (2) the clause was mandatory and not merely permissive; and (3) the claims and parties involved in the suit are subject to the forum selection clause." Shipco Transp., Inc.

[6] Federal law governs whether enforcement of the Guaranty's forum selection clause is enforceable and confers personal jurisdiction in this case. See Magi XXI, Inc. v. Stato della Citta del Vaticano, 714 F.3d 714, 721 (2d Cir. 2013) ("Because [q]uestions of venue and the enforcement of forum selection clauses are essentially procedural, rather than substantive, in nature, federal law applies to the interpretation of forum selection clauses in diversity cases.").

v. Roll on Roll off Co., LLC, 684 F. Supp. 3d 156, 161 (S.D.N.Y. 2023); see also Phillips v. Audio Active Ltd., 494 F.3d 378, 383 (2d Cir. 2007)). Haverhill has made all three showings.

First, the forum selection clause in the Guaranty was reasonably communicated to Algoma.[7] The Guaranty was included as an attachment to and referenced in the Coke Agreement signed by Algoma. "It would be illogical for [Algoma] to disclaim knowledge" of the clause, given its obvious awareness of the contract in which the clause was contained. See Leviton Mfg. Co. v. Reeve, 942 F. Supp. 2d 244, 256 (E.D.N.Y. 2013), amended (Mar. 23, 2013); Overseas Ventures, LLC v. ROW Mgmt., Ltd., Inc., No. 12 CIV. 1033, 2012 WL 5363782, at *4 (S.D.N.Y. Oct. 26, 2012) ("In general, awareness by a nonsignatory of a forum selection clause or the contract in which such a clause is contained is enough to satisfy the first condition." (emphasis added)).

Second, the forum selection clause "was mandatory." Shipco, 684 F. Supp. 3d at 161. "A forum selection clause is viewed as mandatory when it confers exclusive jurisdiction on the

---

[7] Even if this were not the case, "[i]n the absence of direct communication of a forum-selection clause to a non-signatory, the non-signatory may nevertheless be bound by the clause if . . . the non-signatory is closely related to a signatory [of] the contract." Here, as the Court explains below, non-signatory Algoma is very closely related to signatory ASG. Overseas Ventures, LLC v. ROW Mgmt., Ltd., Inc., No. 12 CIV. 1033, 2012 WL 5363782, at *4 (S.D.N.Y. Oct. 26, 2012).

designated forum." Phillips, 494 F.3d at 386. Here, the clause in the Guaranty states that each party "irrevocably . . . submits to the exclusive jurisdiction of New York state courts and the United States District Court located in the Borough of Manhattan . . . ." ECF No. 13-3, Sched. 3 at § 12. This language is mandatory.

Finally, the claims and parties involved in the instant action are subject to the Guaranty's forum selection clause. See Shipco, 684 F. Supp. 3d at 161. "When, as here, a party does not sign the contract containing the forum selection clause, it may still nonetheless be bound by its terms." Shipco, 684 F. Supp. 3d at 161; cf. Aguas Lenders Recovery Grp. v. Suez, S.A., 585 F.3d 696, 701 (2d Cir. 2009)); Overseas, 2012 WL 5363782, at *5. The Second Circuit has "permitted non-signatories to an agreement to be bound by, and to enforce, forum selection clauses where, under the circumstances, the non-signatories enjoyed a sufficiently close nexus to the dispute or to another signatory such that it was foreseeable that they would be bound." Fasano v. Li, 47 F.4th 91, 103 (2d Cir. 2022). This inquiry — often referred to as the "closely related test" —is easily satisfied here.

Algoma is a wholly owned subsidiary of ASG. Indeed, the Guaranty itself acknowledges Algoma and ASG's parent-subsidiary relationship. See id. at 103-04 (finding that nonsignatories

could be bound by a forum selection clause because they were "wholly owned and 60% owned by" the largest stockholder of a signatory); Shipco, 684 F. Supp. 3d at 162 (a relationship "as an agent, an alter-ego, an affiliate, an owner" may support a closely related finding); In re Optimal, 813 F.Supp.2d at 369 (non-signatories were closely related where they provided advisory services contemplated by the contract to the signatory); cf. Arcadia Biosciences, Inc. v. Vilmorin & Cie, 356 F. Supp. 3d 379 (S.D.N.Y. 2019) (reasoning that "non-signatories are less likely to be 'closely related' to signatories where their connection . . . is horizontal rather than vertical").

Moreover, Algoma "had an active role in the transaction between the signatories," such that it was entirely foreseeable that it would be bound by the forum selection clause in the Guaranty. NuMSP, LLC v. St. Etienne, 462 F. Supp. 3d 330, 351 (S.D.N.Y. 2020). The Coke Agreement, signed by Algoma, was attached to, and expressly contingent on, the Guaranty. For its part, the Guaranty was wholly concerned with performance of the Coke Agreement. The Coke Agreement attaches and references the Guaranty, providing that Algoma's obligations under the Agreement "shall be guaranteed by [ASG], pursuant to a guaranty in the form of Schedule 3 that [Algoma] shall cause to be executed and delivered to [Haverhill] on the Effective Date." Id. § 4. Symmetrically, the Guaranty "irrevocably and

unconditionally guarantees to [Haverhill] . . . the prompt payment of the payment obligations of [Algoma] under the [Coke Agreement]" and provides that its execution "is a condition precedent to the consummation by [Algoma] of the transactions contemplated under the [Coke Agreement]." Id.

Under these circumstances, it was entirely foreseeable that Algoma would be bound by the terms of the Guaranty, including its forum selection clause, and that the forum selection clause would apply to the instant claim for attachment. See KTV Media Int'l, Inc. v. Galaxy Grp., LA LLC, 812 F. Supp. 2d 377, 386 (S.D.N.Y. 2011) ("[I]t is well established that a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses."); Overseas, 2012 WL 5363782, at *6 (concluding that a forum selection clause in an agreement between plaintiff and a third party was enforceable against a non-signatory defendant because executing that contract was an express condition of the contract between the plaintiff and defendant).

Therefore, Haverhill has satisfied the three conditions required to establish presumptive enforceability of the Guaranty's forum selection clause in this case. See Phillips, 494 F.3d at 383. Algoma has not attempted to rebut this presumption. While a party opposing enforcement of a forum selection clause may "rebut[] the presumption of

enforceability," see id. at 383-84, Algoma has not attempted to do so here.

Instead, Algoma offers two other arguments, both of which are unavailing. First, Algoma argues that because the Coke Agreement expressly provides for arbitration in Chicago, it is not possible to read the Guaranty to require litigation in New York of the instant claim for attachment in aid of arbitration. This argument is not without force, since "courts have declined to apply the closely related standard when the signatory and non-signatory have a separate preexisting contractual relationship, in which they had an opportunity to negotiate and agree to a forum selection clause" and either declined to do so or reached a different agreement as to forum. See Shipco Transp., Inc. v. Roll on Roll off Co., LLC, 684 F. Supp. 3d 156, 162 (S.D.N.Y. 2023). Here, however, the Coke Agreement is not a separate, preexisting agreement; rather, the two agreements were contemporaneous with, and contingent upon, one another. Moreover, while the Coke Agreement specifies that claims arising out of the Agreement must be subject to arbitration in Chicago, it separately provides that parties may seek interim relief from any court with jurisdiction. Thus, there is no tension between the arbitration provision in the Coke Agreement and the conclusion that the Guaranty's forum selection clause applies to the instant action.

Second, Algoma argues that even if jurisdiction is consistent with the above-described factors, jurisdiction is inconsistent with due process given this Court's holding in Arcadia Biosciences, Inc. v. Vilmorin & Cie, 356 F. Supp. 3d 379 (S.D.N.Y. 2019). First, while this Court cautioned in Arcadia against "a liberal application of forum selection clauses to non-signatory defendants," it did not hold that a non-signatory defendant could never be bound by a forum selection clause. More to the point, the linchpin of the well-settled rule "that forum selection clauses may bind non-signatories," which ensures the rule comports with due process, is foreseeability. Overseas, 2012 WL 5363782, at *5. In Arcadia, this linchpin snapped because the forum selection clause at issue was executed eight years before the non-signatory defendant became an affiliate of the signatory's sister company. 356 F. Supp. 3d at 390 n.3, 395. By contrast, here, the relationship between Algoma and the forum "arise[s] out of contacts that [Algoma] [itself] create[d]." Id. at 395. Algoma's close relationship with ASG, taken together with its close contractual relationship to the Guaranty, are not "too thin a reed on which to rest" the Court's jurisdiction. Id.

In sum, the Court concludes that the forum selection clause in the Guaranty is valid and enforceable, and that Algoma voluntarily consented to personal jurisdiction in this District for the purposes of pre-award attachment.

**B. Factors Favoring Attachment**

Having concluded that jurisdiction is proper in this case, the Court now turns to the merits of Haverhill's petition. The Court concludes that Haverhill has established its entitlement under New York law to an order confirming attachment in aid of arbitration.[8]

As an initial matter, because attachment is a pre-award remedy that "deprives the defendant of the free use of his property before a final adjudication on the merits," Vincent C. Alexander, Practice Commentaries, McKinney's Cons. Laws of N.Y., C.P.L.R. C6201:0 (2026), "New York attachment statutes are construed strictly against those who seek to invoke the remedy," Swift Splash Ltd. v. Rice Corp., No. 10 Civ. 6448, 2010 WL 3767131, at *2 (S.D.N.Y. Sept. 27, 2010). Algoma, "[a]s the party seeking an attachment and confirmation," therefore "bears a heavy burden in attempting to establish its right to attachment." Id.

Nevertheless, "[w]hen evaluating a motion to confirm an attachment, a district court must give the plaintiff the benefit of all the legitimate inferences that can be drawn from the

[8] Under New York Law, "[a]ny debt or property against which a money judgment may be enforced as provided in [N.Y. C.P.L.R.] 5201 is subject to attachment." N.Y. C.P.L.R. § 6202; see N.Y. C.P.L.R. § 6211(a). Here, the property specified in the Order of Attachment plainly falls within the bounds of C.P.L.R. 5201.

facts pleaded." BSH Hausgerate, GmbH v. Kamhi, 282 F. Supp. 3d 668, 672 (S.D.N.Y. 2017). Whether to confirm an order of attachment "rests within the discretion of the court," which "includes the power to consider nonstatutory factors." VisionChina Media Inc. v. S'holder Representative Servs., LLC, 967 N.Y.S.2d 338, 345 (1st Dep't 2013); see Iraq Telecom Ltd. v. IBL Bank S.A.L., 43 F.4th 263, 271 (2d Cir. 2022).

To begin, a petitioner "seeking attachment [must] establish one of five statutory bases for attachment, among them that the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state."[9] Iraq Telecom, 43 F.4th at 269. Haverhill satisfies this threshold requirement, since Algoma is a foreign corporation incorporated in British Columbia, Canada, with a principal place of business in Ontario, Canada, and it is not registered to do business in New York. Pet. ¶¶ 15-16; see N.Y. C.P.L.R. § 6201.

Next, to obtain or confirm an order of attachment in aid of arbitration, Haverhill must make four further showings: (1)

[9] Some courts in this District have held, since Iraq Telecom, that petitioners seeking attachment pursuant to C.P.L.R. 7502 do not need to satisfy the statutory prerequisites provided by C.P.L.R. 6201. See White Lilly, LLC v. Balestriere PLLC, No. 18 Civ. 12404, 2022 WL 4365615, at *3 (S.D.N.Y. Sept. 21, 2022)("A party seeking attachment under § 7502(c) need no longer meet the requirements of § 6201."). Because Haverhill easily satisfies the criteria set forth in Section 6201, there is no need to explore this question any further.

"there is a cause of action," (2) "it is probable that [Haverhill] will succeed on the merits," (3) "the amount demanded from [Algoma] exceeds all counterclaims known to [Haverhill]," and (4) "that the award to which [Haverhill] may be entitled may be rendered ineffectual without such provisional relief." N.Y. C.P.L.R. §§ 6212(a), 7502(c); see Iraq Telecom, 43 F.4th at 269. Haverhill satisfies all four of these elements. The Court takes each in turn.

**1. A Cause of Action Exists**

To satisfy the first element, Haverhill must show that "there is a cause of action." C.P.L.R. § 6212(a). New York law provides that "arbitration shall be deemed an action for this purpose." N.Y., 7502(c). Haverhill filed an amended arbitration demand against Algoma alleging breach of the Coke Agreement and seeking specific performance or, alternatively, monetary damages. See Pet. ¶¶ 1-3. Thus, Haverhill has established that there is a cause of action for purposes of the first element.

**2. It Is Probable Haverhill Will Succeed on the Merits**

Turning to the second element, Haverhill must demonstrate "that it is probable that [it] will success on the merits." C.P.L.R. 6212(a). That inquiry "is measured in terms of the likelihood of success in arbitration." Iraq Telecom, 43 F.4th at 269-70. The Court concludes that Haverhill has demonstrated a sufficient likelihood of success to satisfy the second element.

While "probability of success [in arbitration] cannot be predicted with the confidence a court would have in predicting the merits of a dispute awaiting litigation in court, . . . the plaintiff must be given the benefit of all legitimate inferences and deductions that can be made from the facts stated." Id. at 270. In evaluating a petitioner's probability of success, "evidentiary facts making out a prima facie case must be shown." Considar, Inc. v. Redi Corp. Establishment, 238 A.D.2d 111, 111 (1st Dep't 1997). Moreover, "there must be something in the proof stronger than the mere prima facie case that could satisfy as a pleading." David D. Siegel, N.Y. PRAC. § 316 (6th Ed. 2024).

Evaluating Haverhill's probability of success depends principally on determining whether Algoma's frustration of purpose defense is likely to prevail. Algoma's position is that it was discharged from its contractual obligations under the Coke Agreement because of the federal government's imposition of 50% tariffs on Canadian steel products. See Pet. Reply Mem. at 8; Resp. Mem. at 2. The Court concludes that Algoma's defense to performance lacks merit. Therefore, Haverhill is likely to succeed in its claim that Algoma breached the Coke Agreement.

"The doctrine of frustration of purpose discharges a party's duties to perform under a contract where a wholly unforeseeable event renders the contract valueless to one

party." Axginc Corp. v. Plaza Automall, Ltd., 759 F. App'x 26, 29 (2d Cir. 2018). In other words, "the frustrated purpose must be so completely the basis of the contract that, as both parties understood, without it, the transaction would have made little sense." Crown IT Servs., Inc. v. Koval-Olsen, 11 A.D.3d 263, 265 (1st Dep't 2004).

"It is not enough, however, that the transaction will be less profitable for an affected party or even that the party will sustain a loss." Gap Inc. v. Ponte Gadea New York LLC, 524 F. Supp. 3d 224, 234 (S.D.N.Y. 2021). "[W]here . . . difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused." 407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp., 23 N.Y.2d 275, 281 (1968).

Algoma argues that a shared premise of the Coke Agreement was the continued existence of a U.S. market for steel products manufactured in a blast furnace. Id. at 21. Put differently, a shared premise of the Coke Agreement was that Algoma would continue to need coke. Algoma asserts that, when the U.S. imposed 50% tariffs on Canadian steel imports, its product was rendered uncompetitive in the U.S. steel market and operation of its blast furnace were too costly to sustainably maintain. See Resp. Mem. at 5-6. To continue to serve strategic U.S.

customers, Algoma accelerated its switch to an electric arc furnace ("EAF"), which does not require coke to operate. Id. at 6. Through this chain of financial pressures, Algoma's need for coke was obviated by the tariffs. On Algoma's account, this nullified the core purpose of the Coke Agreement and excused continuing performance.

But there is nothing in the present record that suggests the continued availability of a profitable U.S. market for blast furnace steel was a shared premise of the Coke Agreement. The Agreement provides that the coke would be used in Algoma's Canadian steel-making operations, but it makes no reference to the markets in which Algoma's steel would be sold, or the conditions under which Algoma would consider it sufficiently profitable to continue using coke in its steel manufacturing process.

Even if one were to suppose the unlikely and unsupportable proposition that Algoma's sale of steel to U.S. customers was a significant part of the mutual purpose of the Coke Agreement, that purpose was not frustrated at law. Access to the U.S. market is still possible; it is just substantially more costly. See Gap Inc. v. Ponte Gadea New York LLC, 524 F. Supp. 3d 224, 234 (S.D.N.Y. 2021). The fact that Algoma "may suffer particularly adverse financial consequences" from the imposition of tariffs, perhaps exacerbated by being held to its preexisting

contractual obligations under the Coke Agreement, "does not amount to frustration of the purpose of the" Agreement. See id. at 235 (collecting cases).

Indeed, it is well established that "partial frustration such as a diminution in business, where a [party] could continue to use the [product] for an intended purpose, is insufficient to establish the defense as a matter of law." A/R Retail LLC v. Hugo Boss Retail, Inc., 72 Misc. 3d 627, 642 (N.Y. Sup. 2021); see also Robitzek Investing Co. v. Colonial Beacon Oil Co., 265 A.D. 749, 753 (1st Dep't 1943) (finding that a lease was not completely frustrated when the defendant "could have continued to operate a gas station . . . within the terms of the lease though the volume of its business might have suffered substantial diminution because of . . . Federal regulatory measures").

In the Court's view, "the evidence suggests that [Algoma] has made a business decision to" transition to EAF steel production. Gap Inc., 524 F. Supp. 3d at 235. Of course, this business decision was precipitated by a "change in market conditions [and] an increase in the cost of performance." Health-Chem Corp. v. Baker, 737 F. Supp. 770, 776 (S.D.N.Y.), aff'd, 915 F.2d 805 (2d Cir. 1990). But these "are insufficient grounds to assert New York's frustration of purpose

defense." CAI Rail, Inc. v. Badger Mining Corp., No. 20 CIV. 4644, 2021 WL 705880, at *8 (S.D.N.Y. Feb. 22, 2021).

In sum, Algoma's voluntary commercial decision to reduce its need for coke does not furnish a defense to performance of the Coke Agreement. Accordingly, Haverhill is likely to prevail in showing that Algoma breached the Agreement and lacks a viable frustration of purpose defense. The Court therefore concludes that Haverhill has satisfied the second element required to establish entitlement to confirmation of attachment.[10]

**3. A Future Award May Be Ineffectual Without Relief**

The third element Haverhill must satisfy is "that the award to which [it] may be entitled may be rendered ineffectual without such provisional relief." N.Y. C.P.L.R. § 7502(c).

[10] Even if the Court were persuaded that the tariffs prevented Algoma's performance of the Coke Agreement, "the doctrine of frustration of purpose . . . is not available where the event which prevented performance was foreseeable and provision could have been made for its occurrence." Warner v. Kaplan, 71 A.D.3d 1, 6 (1st Dep't 2009). The U.S. imposed 25% tariffs on Canadian steel imports using the same statutory authority three years before the parties signed the Coke Agreement. See ECF 23 ¶¶ 9-10. While those tariffs were lifted in 2019, and the 50% tariffs at issue here are appreciably more onerous, the Court is not persuaded that the possibility of significant tariffs was beyond the realm of foreseeable events in 2021. More generally, international commercial agreements are foreseeably, indeed inherently, subject to such risks and vicissitudes. Nevertheless, because the tariffs did not completely frustrate the purpose of the Coke Agreement, it is not necessary to determine precisely how foreseeable these tariffs were at the time the parties negotiated the Coke Agreement.

Haverhill need only show "the possibility, if not the likelihood that, absent the attachment being requested, the ultimate arbitration award would be severely compromised." Cnty. Natwest Sec. Corp. USA v. Jesup, Josephthal & Co., 180 A.D.2d 468, 469 (1st Dep't 1992). The Court concludes that Haverhill has satisfied this element because it has sufficiently "demonstrate[d] an identifiable risk that [Algoma] will not be able to satisfy [a future] judgment." Iraq Telecom Ltd., 43 F.4th at 270.

Haverhill cites numerous indicators that Algoma is experiencing significant financial strain and substantially reducing its U.S. business. In 2025, Algoma reported that it absorbed CAD $225 million in direct tariff costs. ECF 13-2 ¶ 42. In connection with its switch between furnaces, Algoma issued layoff notices to 1,005 employees with expected severance costs of CAD $45.8 million. ECF 14-4, at 5. In the first quarter of 2026, ASG reported a decrease in revenue of 42.57% and decrease in steel shipments of 52.4% from the prior year. ECF 13-2 ¶ 43. In addition, in the past few decades, Algoma has experienced bankruptcies; and this year, its bondholders have reportedly been engaging with restructuring counsel. See Pet. Reply at 7; ECF 13-2 ¶ 44. Further, an August 2025 Moody's Ratings opinion stated that Algoma has "weak liquidity" and faces "significant cash burn," ECF 15-4, at 1, and a March 2026 Jefferies report

indicated that "[p]rolonged tariff measures combined with a slowing global economy could pose further liquidity risks to Algoma," ECF 15-5, at 5. And while the parties dispute whether Algoma is "winding down" its U.S. operations, there is no doubt that Algoma has substantially reduced its volume of shipments to the United States and shifted focus to "domestic demand." See Resp. Mem. At 8, 23; ECF 14-4, at 5.

To be sure, Algoma points to evidence that its financial standing does not face any unsupportable risk, and the Court does not conclude that Algoma is on the brink of insolvency. But Haverhill's burden is not to prove that it is certain, or even probable, that Algoma will be unable to satisfy a possible arbitration award. Rather, its burden is to adduce evidence of an "identifiable risk" that Algoma may not be able to satisfy future judgment. See Iraq Telecom Ltd., 43 F.4th at 270. The Court concludes that Haverhill has amply carried that burden. Thus, Haverhill has satisfied the third element required for confirmation of attachment.

**4. The Amount Demanded Exceeds All Known Counterclaims**

Finally, Haverhill must show that the amount demanded from Algoma exceeds all counterclaims known to the Haverhill. See N.Y. C.P.L.R. § 6212(a). "In determining whether [this] requirement . . . is met, courts are to examine only the amount of the counterclaims that the plaintiff concedes are just." Bank

of Leumi Tr. Co. of New York v. Istim, Inc., 892 F. Supp. 478, 482 (S.D.N.Y. 1995). Algoma has not made any argument that it has counterclaims exceeding the value of Haverhill's claims in arbitration. Thus, this undisputed element is satisfied.

## III. Conclusion

For the foregoing reasons, the Court issued its June 18, 2026 bottom-line order confirming the ex parte Order of Attachment entered against Algoma.[11]

New York, NY
August 13, 2026

JED S. RAKOFF, U.S.D.J.

[11] Algoma separately asserts that attachment would be ineffective here because Haverhill cannot jump ahead of Algoma's existing secured creditors. But as Haverhill points out, see Pet. Reply at 10, "to the extent other creditors have an interest in [Algoma's] property, then the priority of the various creditors will be determined at an appropriate time in an appropriate forum. In the meantime, for the reasons stated in the text, [Haverhill's] interest in [Algoma's] property needs to be protected." Disney Enters., Inc. v. Finanz St. Honore, B.V., No. 13CV6338NGSMG, 2017 WL 1862211, at *3 n.3 (E.D.N.Y. May 8, 2017).